Mr. Becker and Mr. Jelle, are you ready? Yes, Your Honor. Okay.  Good morning. Or should I almost say good afternoon? My name is Jay Becker and I'm here representing the appellants Paul Scagnelli and Jim Hamill. I request two minutes for rebuttal, please. Okay. Thank you. Your Honor, we are here today appealing a decision by Judge Cooper, which dismissed the plaintiff's complaints based on a summary judgment motion filed by the defendant Ron Schiavone and the estate of Ron Schiavone, the trust of Ron Schiavone. We believe, Your Honor, that the court, the lower court, erred in its decision in deciding this case on the merits when there are significant questions of fact. The issues really boil down to the essentials. What is the record that gives rise to the questions of fact sufficient to get past summary judgment? As to whether there's a contract. Yes, Judge. I believe that there are a number of facts that are before the court in the record that establish all of the terms that are necessary to establish a contract. In this particular case, under the Bayer v. Chase case, the question was, are the facts sufficiently definitive enough so that performance can be rendered with reasonable certainty? Just take, for example, just prior to the closing in December 31st of 2007. Earlier that month, the letter was sent by the three employees to Mr. Schiavone and Mr. Donovan, and they noted they did not have employment agreements and requested that they provide us with your proposal. It's a quote. Provide us with your proposal on what compensation we can expect for such past efforts as soon as possible. That seems to indicate pretty clearly there just wasn't yet an agreement. There was a desire to get to an agreement. Your Honor, with all due respect, and this is why there's so many questions of fact in this case, you have to look at the relationship that these gentlemen had with Mr. Schiavone for over 30 years. This was a man of integrity and honor. When he said he was going to do something, he did it. There was never, ever a question as to what this gentleman was going to do. But you have to show what the it would have been. That's correct, and there's plenty of evidence before the record that shows not only what the it was, Judge, but when, how, by whom. To answer your question, Judge Ambrose, that was their effort because it was their understanding, and it's in the record, it was their understanding that in order for this deal to close, the three executive members of the management team, the Troika, you've heard that term, they had to be locked up in an employment agreement because it was their understanding they were led to believe. But were they actually locked up prior to the closing in an employment agreement? They were not. So the closing still took place without that? Yes, Judge, but they were led to believe that the deal would not close, that Dragados would not be interested in buying this company unless the three executives that ran the company on a day-to-day basis, Mr. Schiavone was an absentee owner. He was retired and in Florida. If it wasn't for these three people that ran the company on a day-to-day basis, were locked up, then there was no value in the company. Dragados had no interest in this company if it wasn't for these three. And so they were trying, I'm sorry, Judge. They were trying to do the best they could in the most polite, respectful manner that they could with this gentleman that they'd worked with for 30 years to say, let's get it done. We don't want to be the ones to hold up this closing. Let's get this done. And if I may, Your Honor. But what you would need there is something, for example, from Mr. Schiavone saying, I understand. We are going to get it done. And I promise you, for your willingness to stay, I am going to give you something. And I believe the record is filled with those promises, Your Honor, if I may. Well, go ahead. Now, this case, is there a demand for a jury trial? Yes, Judge. Well, how would you try this case to a jury? I mean, how would it be presented to a jury? Would you ask them to make findings that there was an agreement? What would you ask them to do? I would establish that there was enough evidence before the record that there was an agreement. It wasn't a written contract, but there's enough evidence to show that there was an understanding, there was a meeting of the minds between the parties. And then I also believe there's enough before the record to show what that meeting of the mind was. Not only... Well, what was it? What was it? There were representations made by Mr. Schiavone himself. There were a number of communications made by the Troika to Mr. Schiavone, where the specific issue about a 2% of the purchase price was included, about who was going to pay that, the owners of the company. There are statements made directly by the owners of the company that they will take responsibility. If I may, Judge, I have every intent, I will absolutely do this. In the letter by Mr. Donovan, I'm sorry, by Mr. Schiavone, when he finally, in August of 2008, after two years of communicating with the Troika, the owners of SCC made representations. Not SCC made, but the owners of SCC made representations. What did Mr. Schiavone specifically say? Mr. Schiavone specifically said that he will do something, hang in there, we will take care of you. And all of these statements that were made by him were memorialized by the Troika. But the question is, what is the something? The something is 2% of the purchase price. Well, I don't know that. I mean, I'll do something. Obviously, Mr. Donovan did do something. He gave, what, $750,000 to each? Mr. Donovan did. And this is, Your Honor, the Troy B. Rutgers case talks about silence equating to assent. And there is plenty of silence in this case, which we believe, at least as a question of fact, creates assent. And that is this. Mr. Schiavone, no one can argue his business acumen. Nobody can argue how successful he was. It's clearly a question of fact as to whether you have these three executives that are running his company. He trusts them to run his company on a day-to-day basis. Yet they are communicating with him on a number of occasions, and he does not respond. He never offers a letter refuting it. He never contests it. He never says, no, I'm not giving you 2%. He never says, no, the individual owners are not going to be responsible. All these are memorialized in writings to Mr. Schiavone, and he never contests that. But it looks as if what they were doing is they were still negotiating the contract. I mean, for example, the terms of the first and the second drafts of the agreements, they differed. I mean, so the second draft looks like it's a counterproposal. I mean, this is classic contract formation, and you need more something that is significantly more substantial to show that there is a contract actually formed. Your Honor, if you take a look at the totality of the circumstances and the extrinsic evidence that's attached, the owners, the bonding companies and the owners, asked the Troika to put together a proposal. They did that. It was presented to Mr. Schiavone. For whatever reason, he did not like the form that it took. But the sum and substance of the two agreements were essentially the same. There were differences. There were absolutely differences. Sum and differences? There were differences, absolutely. Well, there were differences in the rate, wasn't there? Raises, bonuses, termination, restrictive covenants? There was a substantive. Right. But if you look at the record, every time that the gentleman tried to get Mr. Schiavone to sign on the dotted line, it was always about just – it was never about we need to continue negotiating. It was just we need to get this done because, A, the deal won't close unless we are locked up to an employment agreement, and, B, we've known you, Mr. Schiavone, for 30 years. When you said you're going to do something, you're going to do it. So what happened post-closing in their discussions? Post-closing, Mr. Schiavone stopped communicating with them altogether. He told the troika that my lawyers told me to stop communicating with you. And for the very first time, Judge, for the very first time in August of 2008, after getting communications from 2006, 2007 meetings, meetings at Fiddler's Elbow Country Club, which was owned by Mr. Schiavone, meetings in his home where minutes were taken, simultaneous minutes were taken of the meeting, contemporaneous notes, and presented to Mr. Schiavone, and never once did he say in April of 2007, no, that's not what happened in the meeting. No, that's not correct. It was only until after the closing, after the deal went down, after Mr. Schiavone got his $75 million, did he say there must be a misunderstanding. And I'd love to point to that letter itself, Your Honor, because in that letter he specifically says – he uses the language, that joint exhibit number 194. He specifically refers to the owners of SCC were under no obligation to make. He didn't refer to SCC, Schiavone Construction Company, was under no obligation. He refers to himself. And Mr. Donovan referred to himself in the settlement agreement that he made with the troika, where he said, this was coming out of my shares, so the terms in the record is full of the words, I, me, my. When did Mr. Schiavone die? I believe it's been two years now, Judge. Two years, okay. So from 07 until 11, that's eight, nine, ten, three-plus years, there was no reconciliation of whatever the purported arrangement was. Correct. Well, it was actually between 06 is when the bonding companies requested the employment agreements. Correct. And I'd like to point out that it wasn't just an employment agreement. It was an employment agreement and a sale participation agreement. And if you look, there were different forms with respect to the employment agreement, but the sale participation agreement was the same document. It just had handwriting, which, Your Honor, Judge Ambrose, you asked me, where do we get the number from? Mr. Schiavone himself, in his own deposition testimony, admitted that he handwrote the number 2%.  He increased that from 1.66 to 2%. It was part of an employment agreement that had other significant provisions, not all of which were ironed out prior to the closing. But, Your Honor, this goes to the – Isn't your better argument, I mean, isn't your better argument that the promissory estoppel claim possibly, as opposed to the contract claim? We believe that Judge Cooper erred in deciding that there was not enough definitiveness in that as well. And if we want to get to that, the Commerce case specifically talks about promissory estoppel. And I think there's plenty of – again, I'm going to go to the definitiveness of the – whether it was the agreement that they had or the relationship and the promise that was made. The promises that were made, Mr. Schiavone would use the term, I will take care of you. I. I promise. I will do something. I have every intention to meet with you individually. And they clearly relied upon that. And the issue would be, one, is the reliance reasonable? And two, if it is reasonable, what's the dollar value of the reliance? The reliance, Your Honor, is these gentlemen were asked by both Mr. Donovan and Mr. Schiavone to help facilitate the sale of their company. Was it the bonding companies that put the idea in the minds of Mr. Schiavone and Mr. Donovan that maybe we should sell the company because they're looking to get these executives tied up because we're not going to be here forever? One was in his 80s, one was in his late 70s. The fact of the matter is they were marketing the company. And they made representations to my client. You help facilitate the sale. You counsel us on it since you're the ones running the business on a day-to-day basis. And we'll take care of you. Self-participation is a very common incentive in businesses. It was not uncommon in this one at all. And when they counseled the owners on a potential $60 million sale to Lacadia, they specifically said, we don't think this is a good idea. This is not in the best interest of the company. This is not in the best interest of the owners. And sure enough, they ended up selling the company for $150 million one year later to Drogados. And in Mr. Donovan's settlement agreement with the gentleman, he specifically wrote, for your anticipated cooperation and assistance in the sale. That was the reliance. That was the representation made to them. And they relied on it, figuring for 30 years we could trust these men. They say they're going to do something. They do it. We're not going to go and look for another job. They admitted in their testimony we didn't try to find another job. Why would we? We know this company is being marketed for sale. We have the potential of earning a significant incentive, as told to us by the owners. Why should we look for another job? Why should we do any of that? We're going to trust the people that have told us what they're going to do. And another piece of evidence that I think is critical is… Well, in a promissory estoppel theory, what would the jury, if you win, what would the jury determine would be owed? Because there were different numbers that came around. That's correct, Your Honor. At one point in the initial draft, it was 1.66 of the purchase price. The handwritten change by Mr. Schiavone himself was 2%. We believe that it was 2% as Mr. Schiavone wrote that term in. Every conversation, every document that's in the record that was either the notes memorializing minutes of a meeting by Mr. Hamill refers to 2% to be split 50-50. That was presented to the owners. They never refuted it. They never wrote backs and contested it. You want us to remand this for a jury trial? Correct, Your Honor. You know, the Beare v. Chase, I happen to write that, that had a grim outcome because that's what we did from the point of view of the plaintiff. We said, okay, you're entitled to a jury trial. They got no cause. But, Your Honor, I believe that the Beare case is distinguished significantly. In Beare, there was not even a range, as I recall. There was no structure. This one, we have a range. This one, we're going to take the position it's 2%, but even if someone wants to take a position, it was between 1.66 and 2. When Mr. Schiavone promised that he was going to do something, he wasn't promising them a piece of heavy equipment. He wasn't promising them a piece of the golf course or I'll buy you a dinner or I'll give you a gold watch. He was giving them money. He was giving a percentage of the sale proceeds, and that percentage was established 2%, not just in his own handwriting, but memorialized in a letter from Jim Hamill, memorialized in a letter from the Troika, and I think it's telling what Mr. Donovan did. Even though the record is clear that the two individuals clearly stated that they were going to do things on their own, Mr. Donovan offered them $750,000 each, and Mr. Casenzo, when he wrote to Mr. Schiavone saying, we settled our issue with Ronnie, with Ray, and even though it was half of what we expected, and $750,000 payment is half of the 2% number. It's half of 1.5. So there's additional extrinsic evidence to show the meeting of the minds. I'm just wondering if that, maybe an evidence reach, I assume that would come in, but I'm not sure if an offer uncompromised. That was made uncompromised with Donovan. You could clearly argue that it's relevant to Schiavone's understanding of the value of the reliance, if you will, or what he would owe them in terms of the percentage of the sale, but I'm just not sure if that comes in or not. I don't know. I had to research it, but I'm not so sure that gets in. I believe because there's plenty of information in the record to show that these two owners stated in a numerous fashion that they would undertake this responsibility individually. It shows the meeting of the minds. It shows what the intent was of the parties. It certainly shows what the reasonable expectation was. That's the argument. I'm just not sure. It's not my job to decide it. Why do the Troika remain, or two remain and one left after the sale? Well, Your Honor, since this time, all three are no longer with the company. As of this, yes, after the sale, all three stayed with the company after the sale. They did their job. They assisted with the sale. They stayed there. Since then, one left on its own, one retired, and Mr. Scagnelli just recently retired. My two clients, the Troika, there were three. Carl Casenzo decided not to appeal the decision. Paul Scagnelli and Jim Hamill. Jim Hamill retired last year. Paul Scagnelli just retired within this past year. I notice that my red light is on. You saved some time, I think, didn't you? Yes, I have two minutes. Okay, great. Thank you. Okay, thank you, Judge. Good afternoon, Your Honors. Lindsay Taylor on behalf of Ron Schivone. What the case really comes down to, Your Honors, and this came out in the prior argument, is offering acceptance. You've got a good point. But why isn't this a textbook estoppel case? I mean, there's no formal offering acceptance. You've got these competing drafts. The representation was made that I suggested the change was substantive. You can argue about just how substantive it were, but there is clearly reliance. The only issue, and this is clearly to their detriment, the only issue is how reasonable was that reliance? Mr. Becker is arguing, look, they worked with these guys for 30 years. They kept getting assurance from Mr. Schivone that he was going to take care of them. Why in the world would they not believe this guy, who they had every reason to believe for 30 years had been a straight shooter? Why isn't this a perfect textbook estoppel case in terms of the measure of damages? Mr. Becker is right. The $750,000 that was paid, even though it was in compromise, is one-half of the 2%.  Well, the payment that they received from the one person who paid totally consistent with that and is proof of what their understanding would have been and proof of how reasonable their reliance is. Why isn't that a perfect way of looking at this case, except for the fact that you lose? Why isn't that a perfect way of looking at this case? For two reasons, Your Honor. First of all, with respect to the reliance issue, it might be, as you say, reasonable to rely in terms of their believing that he was going to do something, whatever that something was. They gave up a right they could have left, and they continued the management and facilitation of the deal and the management of the company for a period of time thereafter, and that showed their reliance. The point is, why not let that go to a jury? Because, first of all, they really didn't give up anything. They had no intention of leaving Schiavone Construction. But they had that right. They did. They had the right. They had no intention of leaving because the guy had been working there for 30 years and said, don't worry, I'm going to take care of you. And what detriment did they incur by staying on? They didn't pass up a better job. They didn't incur any expenses. Like, for example, in the Commerce Bank case. They didn't go look for another job. They stayed with this. And it was, you know, there wasn't an agreement. You get down to the closing time, and they say, you know, hey, we're getting close. We really need to have an agreement. And it's almost like, okay, just stay, because the bondholders wanted them to stay. Other people, Drogados wanted them to stay, and they did stay. And, you know, one could argue after 30 years, after the type of relationship they had with Mr. Schiavone and Mr. Donovan, that they stayed almost out of love. And so they're asking to be, you know, with this type of really good payout, and I can understand why Mr. Schiavone and Mr. Donovan want to sell, they're going to stay, and they'll be taken care of. They relied on it. Now, maybe they lose, but why doesn't that go to a jury? Because they didn't give up anything. You said they gave up the possibility of looking elsewhere. They did, but what monetary burden or what monetary adverse effect did they have on them? Zero. They might have been thinking about retiring. One of the three did retire very soon thereafter. I'm sorry. Mr. Consenso left at the request of the U.S. attorney in the Eastern District of New York because of some minority hiring issues. Okay. But the point is, do we sort this out or allow a district judge to sort this promissory stop or claim out at summary judgment, or do we just allow a jury to sort it out? Again, they may not win. Well, the facts are nonetheless undisputed, and they didn't incur any financial detriment. They didn't incur any detriment at all in relying on Mr. Schiavone's promise. Like, for example, in the Commerce Bank case, the Commerce Bank wasn't suing to put the deal through. What they wanted was while the negotiations were pending and the sellers were saying, you know, let's get this deal done, they went and Commerce Bank went and spent $45,000 to fix up the building, the space, where the buyers were running their business, and they were suing to get that $45,000 back because they had incurred that detriment in reliance on the deal going through. That's separate and apart from enforcing the underlying deal. In a couple of the other promissory estoppel cases where there was somebody picked up and moved in reliance on, in one case, getting a lease in an Atlantic City hotel coming to New Jersey from Boston, they weren't enforcing the lease. They didn't want the deal. They weren't enforcing the underlying employment agreement. They were suing to get their out-of-pocket costs and lost business. When they moved, before they could get their business back up and running again, there's another landlord-tenant case where the landlord gave oral permission to go get a dog. The lady went out and got a dog. There's not any of that sort of out-of-pocket detrimental reliance that Mr. Scagnelli or Mr. Hamill incurred. What they want to do is enforce the contractual promise without having to show or offer an acceptance, without having any consideration. But that's the doctrine of promissory estoppel. That's why it's there. Well, yeah, but they didn't change their position to their detriment. They kept doing the same thing that they were doing before. They got paid the same amount of money. They got their bonuses. They got paid everything that they had been getting before. Where is there a case that says the reliance has to be manifested in a change of position as opposed to simply relying to one's debt protection? Well, that's the difference. I thought there were New Jersey cases that say that if you continue to work, then you're relying on it even if you're just getting the same salary. That is consideration for a promise. For example, signing on with an employment agreement with a restrictive covenant. Continued employment can be consideration for the signing up for a— I don't know if you realize this, but try to think not so much like a lawyer or a judge, but try to think how it looks to people. These guys worked there for years. They're talking about 2%, 1%. And then at the end when the money comes, they don't get a cent. The jury might figure that out. Well, exactly. That's what you're afraid of. So what? They were employees. They weren't shareholders. They got paid piles and piles of money. But people told them, you know, we don't want you to leave. You stay here, and then we're going to get taken care of. There was talk along those lines, but taking care of was getting nothing. Mr. Schiavone had never promised them any specific amount of money or anything in particular. He said, I'll do something for you. Mr. Donovan said— In the end, he did nothing. But what is he supposed— Well, suppose, for example, an argument was made, well, there was a low number there. It went up to 2%, but they certainly should get at least that. What was it? One and a third? One and a half. No, 1.6. I mean, I could see where a jury might think that. But that was also part of a contract negotiation where there was a whole bunch of other issues being negotiated, and the plaintiffs turned it down. It was part of the contract, and they turned it down. They asked for what, 1.5% initially? It was one and two-thirds. One and two-thirds, and then Mr. Schiavone is the one who suggested at that point two. Is that correct? Correct, just on that specific issue. But there was a whole lot of other— He ups the ante to two, and then in the end it comes down to zero. It's a bad card game. Well, it was part of a negotiation of a much broader negotiation, and if I might point out to Your Honor, that offer was for Schiavone Construction to pay it, not for Ron Schiavone to pay it. Those contracts were between these employees and Schiavone Construction. How much did Schiavone Construction pay them? Excuse me? How much did Schiavone Construction pay them? That would be a zero? They paid them about $490,000 a year. In terms of their percentage of the sale, not the salary percentage of the sale? Zero. Zero. And if they want to—if they're saying that those agreements memorialize a contract, then they've got the wrong defendant. They should be suing Schiavone Construction. Well, their discussions were with Mr. Schiavone himself, the owners, correct? Yes, but he was negotiating an employment agreement between these employees and Schiavone Construction, and every name— But the 2%, would that have come from Schiavone Construction? Yes. How so? That's what the contract said. The name on the contract in both their draft and Mr. Schiavone's draft on behalf of the company was it's between Schiavone Construction and the employee. So then why did Mr. Donovan ante up money on his own? He testified at his deposition that he felt that they deserved it, but he also testified in his deposition that there was never any agreement to pay them 2%. He never agreed to that, and the fact that he paid only half is evidence of a compromise or disagreement—a disputed claim, not an agreed-to claim. What part of Schiavone Construction did Schiavone own? 50%. 50%. Well, I can see that they're sitting there and they're figuring, you know, we're dealing here with a former Secretary of Labor of the United States, and we're dealing with a very prominent company, and they're going to take care of this. And they're going to take care of this somehow, even though it's a little—I mean, I could see where they might figure that. Especially since they've been there 30 years. But neither Mr. Schiavone nor Mr. Donovan had ever personally paid them a dime. All of their compensation had always come through the company. They had been employees of the company. They didn't work for Mr. Donovan. They didn't work for Mr. Schiavone. And also, to circle back, you would ask about the percentage. Mr. Donovan paid half of his cut, not half of the 2%. Right. He paid half of his—of half of half. Half of half, yeah, exactly. Well, they made a settlement there. Correct. That was a settlement of a disputed claim. As far as I can see, the record didn't say it, but I gather they must have given a release. Yes, they did. I think that the releases are in the appendix. Oh, they are. I missed it. Well, it wouldn't be the only thing. I have no further questions. I have none either. Thank you. Thank you, Your Honors. Thank you. Thank you, if I may. Judge Greenberg, you brought up a very interesting point. I'd like to elaborate on that. These are very important, sophisticated businessmen. And when they were writing to them, Judge Ambrose, you asked a question as well. They were incredibly delicate in the way that they drafted their letters, because how do you go to men of that statute and say, do it? You have to ask politely. You have to frame your letters in a relatively conservative manner. And this was not a continued negotiation, as I believe you mentioned, Judge Ambrose. This was an attempt to get these two gentlemen that said they were going to do something, which, by the way, Mr. Schiavone admitted in his deposition that he was going to do something, and he further admitted at his deposition that he didn't end up doing anything. And the do something is exactly that. What happened, by the way? I mean, what caused things just to fall apart, to do something, to go from something to nothing and nothing in the middle? Mr. Donovan and Mr. Schiavone did not get along. They did not get along at all. And because of the logistics of the two of them trying to get together to do anything from a business point of view, the logistics of Mr. Schiavone coming up from Florida once or two or three times a year, the logistics of my three clients that were out in the field doing what they did every single day from 530 in the morning until whenever at the end of the night. Logistically, it was impossible to get everyone together, particularly Mr. Donovan and Mr. Schiavone, together in a room to get it done. And logistically, that was the problem. And before you knew it, time went by. The Lacadia deal was suggested. It's not a good idea. At the age of cell phones and e-mail and the Internet and video conferencing, it's hard to explain something by just saying they couldn't get anybody together in a room. No one gets together in a room anymore. With all due respect, Judge, these gentlemen are all in their 70s and … Well, it's not so bad even in the rain. He did okay. He did okay. He did okay. He did okay with conferencing the last time around. My distinguished panel may be much more, you know, efficient with electronics, but I'm not, and I can imagine they're not. As a matter of fact, whenever I try to communicate with my clients, it's the old-fashioned way. We either meet in person or it's over the phone. It's nothing e-mail. So I can imagine back then, and we're talking the construction industry. I don't know how fluent they were with BlackBerrys and whatnot. But if I may just respond to some of the things that Mr. Taylor said, forbearance is an essential element in reliance. And you're correct, Judge Greenberg, that I believe it was the Haverty case that held that you don't need or it might have been the LoBosco case, you don't need to change your job to show that you relied on something or that there was consideration. Your forbearance alone, the fact that you did not go out and look for another job for the mere fact that for 30 years you said you were going to do something, and the record's clear. For 30 years, he did something. Well, there's a history, though, in LoBosco that would allow them to put some kind of quantitative value on what the consideration was. And in the Haverty case, it's very important because... And that's non-published opinion, isn't it? The Haverty case... That's non-presidential, Haverty? It was Haverty v. Andres v. Berger. It's non-presidential. Was it an unpublished opinion? It was a non-published gesture. So it's not really that helpful, but there again, there's a history. There's a history. And the importance of that case is that there was a range. So if there's ever a question of fact as to, well, is it 1.66 percent? Is it 2 percent? Is it half of what... The associate had been paid a certain dollar range in the past, so there was some way of getting a handle on what the value of it was. That's why I tried to use the analogy earlier. It's not like, say, we're going to pay you money, and what that money is, who knows? Or we're going to give you a piece of the golf course, or we'll give you some equipment, but we're not going to tell you it's a bulldozer or a tractor. This was, we know exactly what it was. We know what it was. We know by whom it was going to pay, because both Mr. Schiavone and Mr. Donovan, in numerous documents, including, Your Honor, there was a settlement agreement executed by the Troika with Mr. Donovan in exchange for the money. And in that settlement agreement, it specifically says by Mr. Donovan, I told you that I would pay you a bonus in an amount and on the terms out of my 50% share of the net proceeds. I, and that's the point I'd like to make, in all of the communications, Mr. Schiavone, I will take care of you. Hang in there. That was another thing, Judge McCabe, you mentioned reliance and forbearance. Hang in there. 30 years, if the man says, hang in there, we're going to take care of you. Hang in there. Just be patient. Are you going to go and look for another job? And what happened, Judge Ambrose, you asked the question? The sale went through. Drogados is a Spanish company. The three Troika, who were led to believe by the owners all along that the value of the sale was the three men running the company. And unless they were locked up, Drogados was not going to be interested in the company because who's going to run it? And they soon learned after the sale that Drogados, just part of their culture, they don't have employment agreements with anyone. So once Mr. Schiavone found out that Drogados is not going to lock these three guys up with their own employment agreements because no executive at Drogados has an employment agreement, Mr. Schiavone said, well, I got my money. Donovan's got his money. I live in Florida. I have no commitments. And that's why I'm here. That last statement, you might not want to make that to the jury. That's nothing I cut against you. I'm sorry, which statement? The last statement. I have no commitments. Oh. I'll move to strike that part of the argument. Thank you, Your Honor. Thank you. Unless there's any further questions. No, let's see counsel for a second. Come on up and approach the bar. Approach, Judge? Yeah, come on up. Yeah. Okay. Okay. Okay. Okay. Okay. Okay. Okay. One thing, don't put – don't put it in – don't put it in the – sometimes somebody actually sends in a letter because of his unreasonable position. We don't want to know that. Just say what the doctor said. No. See, I have to add something. If we're going to have a case scream settlement, it's this. It's no principle. It's not an ongoing thing. It's a one-shot deal. There was a lot of money. In other words, I can understand if there's big principles involved. You have to get these off. But there's no principle here. This isn't going to get repeated between these parties, is what I'm saying. The case scream settlement, I thought – and not only that, there is a certain – maybe the plaintiff loses. Plaintiffs. But there's a certain justice, you know, argument. Illegally they lose. That we haven't decided. One more.